UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**11 CIV 7416**

--------------------------------------------------------------X

Case No.

ADELHEID "HEIDI" WAUMBOLDT,

**COMPLAINT**

Plaintiff,

-against-

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

GREGORY CALLIMANOPULOS, *Individually*
BROKERAGE & MANAGEMENT CORP.,
MARINE MANAGEMENT SERVICES, M.C.,

Defendants.

--------------------------------------------------------------X

Plaintiff, ADELHEID "HEIDI" WAUMBOLDT, by her attorneys PHILLIPS &

PHILLIPS, Attorneys at Law, PLLC, hereby complains of the Defendants, upon information and

belief, as follows.

## NATURE OF THE CASE

1.      Plaintiff complains pursuant to <u>Title VII of the Civil Rights Act of 1964</u>, as codified, 42

U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of

1991, Pub. L. No. 102-166 ("Title VII"), the <u>New York State Human Rights Law</u>, New

York State Executive Law §296 *et. seq.,* and the <u>New York City Human Rights Law</u>, New

York City Administrative Code § 8-107, *et. seq.,* and seeks damages to redress the

injuries Plaintiff has suffered as a result of being **sexually harassed**, **discriminated**

**against**, **retaliated against**, **physically assaulted and battered**, severely humiliated,

mentally anguished, and emotionally and physically distressed by her boss **GREGORY**

**CALLIMANOPULOS during her employment as a Personal and Executive**

**Assistant**.

## JURISDICTION AND VENUE

2.     Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 626(c), and 28 U.S.C. §§ 1331 and 1343.   The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in this district, pursuant to 28 U.S.C. §1391(b), based upon Defendants' principal place of business within the Southern District of New York.

## PROCEDURAL PREREQUISITES

4.     Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

5.     Plaintiff received a Notice of Right to Sue from the EEOC, dated 10/12/2011, with respect to the herein charges of discrimination.   A copy of the Notice is annexed hereto.

6.     This Action is being commenced within 90 days of receipt of said Right to Sue.

## PARTIES

7.     That at all times relevant hereto, Plaintiff ADELHEID "HEIDI" WAUMBOLDT ("WAUMBOLDT") is a resident of the State of New York and County of New York.

8.     That at all times relevant hereto, Defendant BROKERAGE & MANAGEMENT CORP. ("BROKERAGE") was and is a domestic business corporation, duly existing pursuant to and by virtue of the laws of the State of New York.

9.     That at all times relevant hereto, Defendant BROKERAGE's principal place of business is located at 40 Wall Street, New York, New York 10005 and was previously located at 90 Broad Street, Suite 2400, New York, NY. 10004.

10.   That all times relevant hereto, Defendant MARINE MANAGEMENT SERVICES, M.C. ("MARINE") was and is a foreign business corporation, duly existing pursuant to and by virtue of the laws of the State of New York.

11.   That at all times relevant hereto, Defendant GREGORY CALLIMANOPULOS ("CALLIMANOPULOS") was and is a resident of the State of New York.

12.   That at all times relevant hereto, Defendant CALLIMANOPULOS was and is an employee of Defendant BROKERAGE.

13.   That at all times relevant hereto, Defendant CALLIMANOPULOS is the Chairman and Owner of Defendant BROKERAGE.

14.   That at all times relevant hereto, Defendant CALLIMANOPULOS was and is an employee of Defendant MARINE.

15.   That at all times relevant hereto, Defendant CALLIMANOPULOS is the Chairman and Owner of Defendant MARINE.

16.   That at all times relevant hereto, **Defendant CALLIMANOPULOS was Plaintiff WAUMBOLDT's supervisor and/or held supervisory authority over Plaintiff WAUMBOLDT**.

17.   That at all times relevant hereto, Plaintiff WAUMBOLDT was an employee of Defendant BROKERAGE.

18.   That at all times relevant hereto, Plaintiff WAUMBOLDT was an employee of Defendant MARINE.

19.   That at all times relevant hereto, Plaintiff WAUMBOLDT worked at 40 Wall Street, New York, New York 10005 and at 90 Broad Street, Suite 2400, New York, NY. 10004.

20.   Defendant   BROKERAGE,   Defendant   MANAGEMENT,   Defendant

CALLIMANOPULOS, are collectively referred to herein as "Defendants."

## MATERIAL FACTS

21. On or about August 4, 2008, Plaintiff WAUMBOLDT began working for Defendant BROKERAGE as the "Personal and Executive Assistant" to Defendant CALLIMANOPULOS.

22. At all times relevant hereto, Plaintiff WAUMBOLDT was an exemplary employee.

23. Throughout her tenure with Defendant BROKERAGE, Plaintiff WAUMBOLDT always received compliments for her work performance and always got along well with all of her co-workers.

24. In fact, as a result of her excellent work performance, Plaintiff WAUMBOLDT even received a pay raise within the first three (3) months of working for Defendant BROKERAGE.

25. However, throughout Plaintiff WAUMBOLDT's employment, **Defendant CALLIMANOPULOS also consistently and continuously sexually harassed Plaintiff WAUMBOLDT**.

26. **Throughout Plaintiff WAUMBOLDT's employment, Plaintiff was consistently and continuously discriminated against by Defendant CALLIMANOPULOS solely due to her gender (female).**

27. Even during her initial interview with Defendant CALLIMANOPULOS, **he asked Plaintiff WAUMBOLDT her height, weight, whether she liked to wear high heels, and whether she had a boyfriend**. While Plaintiff WAUMBOLDT found these questions to be invasive and offensive, she didn't want to jeopardize her chances of being

hired, and thus politely answered each one.

28.    Also, when Plaintiff WAUMBOLDT informed Defendant CALLIMANOPULOS that she did in fact have a boyfriend, he immediately began denouncing their relationship.

29.    Defendant CALLIMANOPULOS then randomly told Plaintiff WAUMBOLDT that his original assistant **Susan Chan had quit because she "was in love" with him and couldn't take the pressure of working with him any longer, and that another assistant, Leeza Cherebetova, had been let go because she "liked my wife too much."**

30.    On Plaintiff WAUMBOLDT's first day at her new job, on or about August 4, 2008, Jeanne Cacciola, Office Manager of Defendant BROKERAGE, informed Plaintiff WAUMBOLDT that **almost everyone who had held Plaintiff WAUMBOLDT's position prior to her had been a young, attractive female**, not exceptionally bright, who didn't last longer than three (3) months.

31.    Later that day, Mr. Richard Baldwin, President of Defendant BROKERAGE, called Plaintiff WAUMBOLDT into his office and presented her with a letter of employment, which he told her to read and sign.  Plaintiff WAUMBOLDT asked him if she **should have a lawyer review it, but Mr. Baldwin informed her that it would not be necessary, as this was a standard letter that was given to all employees**.  As such, Plaintiff signed the letter.

32.    Upon information and belief, the letter was not standard in any way, shape or form and in fact, had been the first time a letter such as this was written, and was done so to encourage Defendant CALLIMANOPULOS' illicit sexual harassment to continue by having employees waive their rights to a trial by jury and waive their rights to arbitration if they did not immediately report the same to Mr. Baldwin in writing less than nine (9)

days after same occurred.

33.   Within the first two (2) weeks of Plaintiff WAUMBOLDT's employment with Defendant BROKERAGE, Defendant CALLIMANOPULOS arranged for Plaintiff WAUMBOLDT to rent an apartment a few doors down from his family's apartment on East 76th Street in Manhattan.

34.   Defendant CALLIMANOPULOS then gave Plaintiff WAUMBOLDT a loan of $7,500 to pay the broker fees, security deposit, and first month's rent, all of which would then be deducted from Plaintiff WAUMBOLDT's salary over the next six (6) months.

35.   **Defendant CALLIMANOPULOS is a controlling, manipulative and abusive individual who began to exploit the power he had over Plaintiff WAUMBOLDT in order to sexually harass her.**

36.   If Plaintiff WAUMBOLDT were to quit she would have no place to live and be indebted to Defendants for her apartment.

37.   **As Plaintiff WAUMBOLDT was now indebted to Defendants for her living arrangements, Defendant CALLIMANOPULOS took advantage of the situation and began to regularly subject Plaintiff WAUMBOLDT to sexual harassment and an overall hostile work environment.**

38.   By way of example, Defendant CALLIMANOPULOS would often make a point to ask Plaintiff WAUMBOLDT into his office to "look at art catalogues" together on his couch, **where he would sit very close so that their arms and legs were touching**. When trying to move to regain her personal space, **Defendant CALLIMANOPULOS would tell her that this was the only way they could both see the books and push his body closer to hers**.

39.   Throughout Plaintiff WAUMBOLDT's entire employment, Defendant CALLIMANOPULOS would **regularly touch Plaintiff buttocks and squeeze.**

40.   In addition, Defendant CALLIMANOPULOS would also come very close to Plaintiff WAUMBOLDT when asking a question, **dominating her personal space to the degree that their noses were at times almost touching and sometimes with him fully grasping her shoulders.** This all caused Plaintiff to feel extremely uncomfortable and intimidated.

41.   Plaintiff WAUMBOLDT was extremely upset and offended by these incidents, and never expected to be the target of such repulsive behavior when she accepted the position as Defendant CALLIMANOPULOS's "Personal and Executive Assistant."

42.   Moreover, Defendant CALLIMANOPULOS would frequently call Plaintiff WAUMBOLDT into his office and ask her **"What type of man do you think I am?"**

43.   In addition, anytime Plaintiff WAUMBOLDT went on a date, Defendant CALLIMANOPULOS would ask to be compared to the person with whom she was going out and would always end the conversation with notions that **"There just aren't any men like me around anymore."**

44.   Even more disturbing, throughout Plaintiff WAUMBOLDT's entire employment with Defendants, when she (Plaintiff) wasn't responsive to his sexual advances, Defendant CALLIMANOPULOS would become explosively angry over the smallest detail, brooding and belaboring the point, **telling Plaintiff WAUMBOLDT that she was dumb, asking if she was mentally handicapped, screaming violently only inches from her face, throwing stacks of papers at her, and even clutching and squeezing Plaintiff WAUMBOLDT's wrists.**

45.   Confused and feeling intimidated, Plaintiff WAUMBOLDT spoke to Mr. Robert Hennebry, CFO of Defendant BROKERAGE, who advised Plaintiff WAUMBOLDT that the joke around the office was that **Defendant CALLIMANOPULOS' Personal Assistants were like a "revolving door."**

46.   Furthermore, Giorgi Lomsadze, Defendant CALLIMANOPULOS' driver of three (3) years, voluntarily told Plaintiff WAUMBOLDT that **Defendant CALLIMANOPULOS had a strict history of only hiring very attractive and dumb young girls to fill the Personal Assistant position**. In fact, Mr. Lomsadze stated one assistant was a porn star and had given him (Mr. Lomsadze) a copy of her video.

47.   During a trip to Defendant CALLIMANOPULOS' office in Greece, Plaintiff **WAUMBOLDT was shocked to see a two foot wooden statue of an erect penis with testicles on his (Defendant CALLIMANOPULOS') book case.**

48.   In or about December 2008, **Defendant CALLIMANOPULOS instructed Plaintiff WAUMBOLDT to search for a wife for a friend, a Scottish Aristocrat named Cree Mackenzie.**

49.   Defendant CALLIMANOPULOS wrote up a personal ad, which stated that **Mr. Cree Mackenzie was looking for "a young and attractive woman who was interested in moving to the Scottish Hebrides,"** and directed Plaintiff WAUMBOLDT to place the ad on *www.craigslist.org* and *www.match.com*.   Defendant CALLIMANOPULOS also instructed Plaintiff WAUMBOLDT to act as Cree's assistant when responding to women's emails and even dictated questions for her to ask these women.

50.   A few days later, Defendant CALLIMANOPULOS directed Plaintiff WAUMBOLDT to sign him up for another dating website, *www.fling.com*. **Fling.com claims to be the "the**

**Hottest Place to Hook Up! Find sex by contacting fellow Fling members and get laid tonight"**. Immediately upon accessing *www.fling.com*, **Plaintiff WAUMBOLDT's computer screen filled up with pornographic pictures of men and women. Some pictures were close-up shots of vaginas, while others were pictures of women suggestively touching their vaginas and breasts, bent over, etc.**

51.   Shockingly, Defendant CALLIMANOPULOS then instructed Plaintiff WAUMBOLDT to click on various photographs of naked women **suggestively touching their vaginas** whom he found attractive so that he would be able to look at their full profiles. Although Plaintiff WAUMBOLDT objected to viewing these pornographic images, Defendant CALLIMANOPULOS wholly ignored her and insisted that she continue using the site.

52.   In fact, **Defendant CALLIMANOPULOS regularly stayed in Plaintiff WAUMBOLDT's office for over twenty (20) minute intervals forcing her to click through various photos of breasts, vaginas, sexual fluids, women involved in sex acts with other men and women, and even had Plaintiff send "winks" to them to initiate contact with these women.** The viewing and showing of these lewd photographs was blatantly inappropriate, unwanted, and illegal.

53.   Defendant CALLIMANOPULOS also instructed Plaintiff WAUMBOLDT to sign up for *www.ashleymadison.com*, a website catered to married men looking to have an affair and a "sugar daddy" relationship with young, attractive, and single women. *Ashleymadison.com* **claims to be the world's leading married dating service for discreet encounters. Plaintiff was absolutely disgusted by this premise, as it portrayed women as merely sex objects with which to have an affair**.

54.   Nonetheless, **Defendant CALLIMANOPULOS would come into Plaintiff**

**WAUMBOLDT's office at least once a day, instructing her to look at various profiles of naked woman on *www.fling.com* and *www.ashleymadison.com*, and would dictate specific messages that he would ask Plaintiff WAUMBOLDT to send out**.

55.     While Plaintiff WAUMBOLDT was out to prove Defendant CALLIMANOPULOS wrong and show that she was more than simply another attractive young woman, she certainly was not immune to his sexual harassment.

56.     On or about March 3, 2009 at around 8:00 am, while in Greece staying on Defendant CALLIMANOPULOS's yacht, (M/Y Celestial), and **while Plaintiff WAUMBOLDT was naked in the bathroom changing her clothing, Defendant CALLIMANOPULOS forced the bathroom door open  and entered as he leered at Plaintiff's naked body.**   Terrified, Plaintiff WAUMBOLDT screamed for him to get out and grabbed a towel to cover her body.

57.     However, rather than leave, **Defendant CALLIMANOPULOS just stood there ogling Plaintiff WAUMBOLDT's naked body** as she fumbled with the towel, until eventually Plaintiff WAUMBOLDT was able to push Defendant CALLIMANOPULOS out of the bathroom.

58.     As if Plaintiff WAUMBOLDT was not traumatized enough, when she next saw Defendant CALLIMANOPULOS, **he had the audacity to tell Plaintiff WAUMBOLDT that he "was surprised just how good she looked naked."**

59.     Plaintiff WAUMBOLDT was offended and scared by the actions and remarks of her supervisor.  While Plaintiff WAUMBOLDT felt the actions of Defendant CALLIMANOPULOS were inappropriate, she did not know how to respond, and was initially apprehensive to report Defendant CALLIMANOPULOS's sexually harassing

behavior out of fear of losing her job and being unable to pay for her apartment.

60.    Although Plaintiff WAUMBOLDT was extremely upset and disturbed, she figured that if she simply continued to reject Defendant CALLIMANOPULOS's unwanted advances, he would stop the inappropriate and illegal behavior.  She was wrong.

61.    On or about March 7, 2009, during a trip to Basel, Switzerland, Defendant CALLIMANOPULOS randomly began talking about his previous assistant, Anna Parker, at which point Plaintiff WAUMBOLDT decided to inform him that she had come across some papers in the office referring to Ms. Parker's sexual harassment lawsuit against Defendants.  **Defendant CALLIMANOPULOS then told Plaintiff WAUMBOLDT that Ms. Parker falsely alleged that he invited her to a strip club.**

62.    Quite outrageously, **Defendant CALLIMANOPULOS then told Plaintiff WAUMBOLDT that he was going to a strip club that night and eagerly invited her to join him**, while jokingly referring to it as the same one to which he had invited Ms. Parker, to which Plaintiff WAUMBOLDT politely declined.  Refusing to take "no" for an answer, Defendant CALLIMANOPULOS continued to press the issue and began pestering Plaintiff WAUMBOLDT that she would be missing out on all the fun.

63.    In or about late-March 2009, Defendant CALLIMANOPULOS assigned Plaintiff WAUMBOLDT the project of finding a curator for his private art collection, but **instructed her to only bring him the resumes of young and attractive women, and was by no means to bring resumes of any males, elderly or overweight candidates**.

64.    Furthermore, once Defendant CALLIMANOPULOS had chosen candidates to come to the office for an in-person interview, he instructed Plaintiff WAUMBOLDT to first look them over and make sure that they were young and attractive.

65.   One very capable candidate, **Diana Erdoff, had sent a photo of herself in which she appeared to be in her early 30's, but when Defendant CALLIMANOPULOS anonymously walked past her in the waiting room, he informed Plaintiff WAUMBOLDT that she was too old,** and accordingly, told her to tell Ms. Erdoff that Defendant CALLIMANOPULOS was unavailable for the rest of the day and then call her a few days later to tell her the position had been filled.

66.   While Defendants eventually hired a young woman named Valentina Cassachia, she lasted only five (5) months before she quit.

67.   Despite Plaintiff WAUMBOLDT's regular requests that he stop his sexual advances, Defendant CALLIMANOPULOS nonetheless continued his sexual harassment.

68.   In or about August 2009, **Defendant CALLIMANOPULOS grabbed Plaintiff WAUMBOLDT's face and actually forced his tongue into her mouth, at which point Plaintiff WAUMBOLDT bit him very hard, enabling her to escape Defendant CALLIMANOPULOS's wrath**.   All through Plaintiff WAUMBOLDT's employment she continued to oppose and object to Defendants sexual advances.

69.   Moreover, on or about August 20, 2009, **while Plaintiff WAUMBOLDT was reading a book on Defendant CALLIMANOPULOS's yacht, she suddenly looked up and found Defendant CALLIMANOPULOS standing over her, with his testicles only inches from her face Defendant CALLIMANOPULOS had pulled his testicles out from his bathing suit. Startled, Plaintiff WAUMBOLDT tried to get up, but Defendant CALLIMANOPULOS pushed her back down, asked what was wrong in a mocking tone, with his testicles hanging out and laughed**.

70.   Fortunately,   Defendant   CALLIMANOPULOS's   son,   Pericles   Callimanopulos,

approached the boat, giving Plaintiff WAUMBOLDT another opportunity to escape.

71.    The next day, on or about August 21, 2009, **Plaintiff WAUMBOLDT complained to Pericles that Defendant CALLIMANOPULOS had sexually harassed her and that it had made her very uncomfortable and nervous**. Surprisingly, Pericles then mentioned that he had seen things like this happen between his father and Plaintiff WAUMBOLDT several times in the past and that he was sorry that she had to put up with such things.

72.    While Plaintiff WAUMBOLDT was hoping that this might finally put an end to the constant sexual harassment, she was horribly mistaken.

73.    **Defendant CALLIMANOPULOS continued his sexually harassing behavior of being sexually suggestive towards Plaintiff WAUMBOLDT, being invasive of Plaintiff WAUMBOLDT's personal space, touching and squeezing Plaintiff WAUMBOLDT's buttocks, and asking Plaintiff WAUMBOLDT what color panties she was wearing.**

74.    On or about February 17, 2010, as the previous curator had quit, Defendant CALLIMANOPULOS hired Giulia Coccia to fill the curator position.

75.    However, just before meeting Ms. Coccia, Defendant CALLIMANOPULOS had interviewed a girl named Selby Drummond, an extremely attractive, tall, thin, and blonde woman who Defendant CALLIMANOPULOS was clearly interested in, even instructing Plaintiff WAUMBOLDT to check the internet a multitudes of times to view her pictures and check her Facebook page.

76.    Defendant CALLIMANOPULOS and Ms. Drummond quickly developed a relationship and continued to see each other even after Ms. Coccia was already hired.

77.    The next time Plaintiff WAUMBOLDT heard of Ms. Drummond was in or about March

2010, when Plaintiff WAUMBOLDT received a very nasty voicemail from a man named **Michael Doull**, claiming he was currently dating Ms. Drummond, and stating, **"Gregory Callimanopulos is a disgusting pervert and will get his just desserts."** When Plaintiff WAUMBOLDT was hired for this position, she never imagined that she would be made the subject of sexual harassment and forced in the middle of other possible cases of sexual harassment.

78. Throughout the end of 2009 and the beginning of 2010, **Defendant CALLIMANOPULOS was constantly critiquing Plaintiff WAUMBOLDT's choices of men and continually telling her that she needed to find a man more like him**.

79. On or about March 10, 2010, in Athens, Greece, **Defendant CALLIMANOPULOS asked Plaintiff WAUMBOLDT to look at phone numbers of girls in the paper offering erotic massages (escorts)**. As Plaintiff WAUMBOLDT was very uncomfortable searching for escorts, she advised Defendant CALLIMANOPULOS that an erotic massage was a bad idea.

80. Unfortunately, Defendant CALLIMANOPULOS nonetheless arranged for the erotic masseuse, **Dragana Mitrovich**, to come that night and boldly asked Plaintiff WAUMBOLDT to first meet Dragana Mitrovich in the lobby of the hotel to determine if she would be young and attractive enough.

81. Defendant CALLIMANOPULOS also told Plaintiff WAUMBOLDT to wait outside his room while he engaged in sexual relations with Dragana Mitrovich and listen to make sure Ms. Mitrovich was not some kind of psychopath, which she did. Plaintiff WAUMBOLDT was disgusted being forced to perform this task.

82. **However, this was not the end of Ms. Mitrovich, as she began sending emails to**

**Defendant CALLIMANOPULOS over Plaintiff WAUMBOLDT's email address of her vagina covered in flowers, as well as her posing in various positions wearing lingerie and playing with children's teddy bears**.

83. Moreover, **she sent highly erotic poetry to Plaintiff WAUMBOLDT's email address, describing her vagina as a "secret garden," which needed his "big watering hose" to make "wet."** Defendant CALLIMANOPULOS took amusement in reading these graphic letters aloud to Plaintiff WAUMBOLDT as to what else she would like him to do with his "big watering hose." Plaintiff WAUMBOLDT was absolutely disgusted and offended by these actions.

84. To date, Defendant CALLIMANOPULOS and Ms. Mitrovich continue to correspond.

85. **Defendant CALLIMANOPULOS was also becoming more and more frustrated by Plaintiff WAUMBOLDT's continued rejections that he actually began to intensify his assaults against her (Plaintiff)**.

86. In or around October 2010, Defendant CALLIMANOPULOS became completely psychotically enraged when he learned that a hotel in Paris had messed up his reservation. Although Plaintiff WAUMBOLDT had no fault in the matter, **Defendant CALLIMANOPULOS slapped Plaintiff WAUMBOLDT's hands so hard that welts began to form and threw her papers all over the floor**.

87. Defendant CALLIMANOPULOS then told Plaintiff WAUMBOLDT that she was **stupid and worthless, mentally incompetent, and was so violent that** Defendant CALLIMANOPULOS WIFE **("TATIANA") later apologized for his "psychotic" behavior**.

88. Due to her hard work and persistence, Plaintiff WAUMBOLDT was able to secure two

rooms free of charge but when she presented this to Defendant CALLIMANOPULOS, **he told her that she "could fuck herself," clearly doing everything in his power to further break her down.**

89.  Plaintiff WAUMBOLDT was so extremely intimidated by these threatening remarks that, without delay, she sent a letter of resignation to Mr. Richard Baldwin, President of Defendant BROKERAGE. For political reasons, Plaintiff WAUMBOLDT was vague about the harassment in the letter.

90.  After learning of Plaintiff WAUMBOLDT's resignation, Defendant CALLIMANOPULOS begged her to reconsider, and promised her a large bonus at the end of the year to make up for the transgressions.

91.  On another occasion, Defendant CALLIMANOPULOS told Plaintiff he will pay Plaintiff **$10,000  a day to "use" her.**

92.  However, rather than stopping the unlawful sexual harassment of Plaintiff WAUMBOLDT, Defendant CALLIMANOPULOS instead escalated the severity of his harassment.

93.  In or about February 2011, during a trip to the Bahamas, as Plaintiff WAUMBOLDT was in her room fixing her hair, **Defendant CALLIMANOPULOS barged into the room completely naked, thrusting his penis in her face, asking "What do you think of me naked?"**

94.  Horrified and scared, Plaintiff WAUMBOLDT told him that she did not want to look and asked him to leave.  **However, rather than leaving, Defendant CALLIMANOPULOS got even closer to Plaintiff WAUMBOLDT, and said, "Come on Heidi."**

95.  As Defendant CALLIMANOPULOS's penis was inches away from Plaintiff

WAUMBOLDT's face, she ran out of the room.

96.   Unfortunately   though,   **Defendant   CALLIMANOPULOS   chased   Plaintiff WAUMBOLDT around the house completely naked** for several minutes until he finally decided to leave her alone.   Plaintiff WAUMBOLDT felt scared, abused and disgusting.

97.   **As such, Plaintiff WAUMBOLDT immediately sent a message via Blackberry Messenger to Jeanne Cacciola, her supervisor and  Defendant BROKERAGE's Office Manager, concerning Defendant CALLIMANOPULOS' ongoing and constant sexual harassment**.

98.   As   a   direct   result   of   Plaintiff   WAUMBOLDT's   complaint,   Defendant CALLIMANOPULOS' retaliation also escalated, and Defendant CALLIMANOPULOS now acted as if absolutely nothing Plaintiff WAUMBOLDT did was good enough.

99.   **For no valid reason, Defendant CALLIMANOPULOS constantly berated Plaintiff WAUMBOLDT's intelligence and also continued to slap her hands when he became upset.**

100.   It was at this time that Plaintiff WAUMBOLDT finally gained enough courage to stand up for herself and told Defendant CALLIMANOPULOS that she was no longer going to accept his sexual harassment, retaliation, and abuse.

101.   Even more degrading, when Plaintiff WAUMBOLDT tried explaining that it's illegal for him to hit her, Defendant CALLIMANOPULOS simply looked her in the eyes, laughed, and said, "I didn't hit you!"

102.   Upset and frustrated that Plaintiff WAUMBOLDT was not giving in to his sexual advances, Defendant CALLIMANOPULOS told Plaintiff WAUMBOLDT that he was no

longer interested in traveling with her, and would instead take Ms. Coccia, his curator, on his trip to Europe on or about March 1, 2011.

103. However, the sexual harassment did not end.

104. In or around February 2011, **Defendant CALLIMANOPULOS directed Plaintiff WAUMBOLDT to go with him to a sex shop "Babeland" to pick out a vibrator** for Ms. Coccia, which he was going to present to her on this trip.

105. At the sex shop, **Defendant CALLIMANOPULOS asked Plaintiff WAUMBOLDT what kind of vibrator she would use and what she thinks he should purchase for Ms. Coccia and suggested a wooden dildo since "it was artistic."** Disgusted and feeling extremely uncomfortable, Plaintiff WAUMBOLDT immediately notified both Ms. Coccia and complained to Ms. Cacciola, Defendants' Office Manager.

106. In March 2010, while staying in London, **Defendant CALLIMANOPULOS** directed Plaintiff WAUMBOLDT to search the web for "Sensual Masseuse" (escorts). During this time, **Defendant CALLIMANOPULOS** sat close to Plaintiff WAUMBOLDT and instructed her o click through a host of young woman until he found a Russian woman he wanted. **Defendant CALLIMANOPULOS** then instructed Plaintiff WAUMBOLDT to call and book an erotic massage in his hotel room.

107. Again, in retaliation for rejecting his sexual advances as well as complaining of his sexual harassment, around March 2011, Defendant CALLIMANOPULOS began to fabricate allegations about Plaintiff WAUMBOLDT, claiming that she suddenly had "poor performance." First, Defendant CALLIMANOPULOS discussed her "poor performance" with Mr. Richard Baldwin, and together they asked Ms. Cacciola to have a sit-down talk with Plaintiff WAUMBOLDT. However, to Plaintiff's surprise, Ms. Cacciola told her

that she was supposed to chastise her for her bad behavior, but because she knew all that had transpired, she could not do so.

108.   Throughout Plaintiff WAUMBOLDT's employment with Defendants, Defendants permitted Plaintiff to make personal expenses on Defendants' company card with the understanding that Plaintiff would reimburse Defendants for same. This was their practice throughout Plaintiff's entire employment with Defendants.

109.   In or about early June 2011, Plaintiff WAUMBOLDT advised Defendant CALLIMANOPULOS that she owed an outstanding $14,000 for personal expenses on her company card.  In response, he awkwardly hugged Plaintiff WAUMBOLDT and told her not to worry and to pay whenever she had the money, as she had done throughout the last three (3) years of working for Defendant BROKERAGE.

110.   On or about June 15, 2011, Plaintiff WAUMBOLDT noticed that Defendant CALLIMANOPULOS' retaliation had risen to new levels.  Defendant CALLIMANOPULOS had never been colder towards Plaintiff WAUMBOLDT, ignoring her, and refusing to look at or even acknowledge her.

111.   Then, on or about June 21, 2011, Defendant CALLIMANOPULOS called Plaintiff WAUMBOLDT into his office and told her that two (2) diamonds, as well as foreign currency in an undisclosed amount, were missing from the safe in his home.  He also added that he could not locate a small antique vase.

112.   Defendant CALLIMANOPULOS said that Genevieve Kappler (another employee of Defendants) was the main suspect and after discovering that he would not be able to claim insurance unless there was a police report, Defendant CALLIMANOPULOS decided to call the police.

113.    The following day, on or about June 22, 2011, Defendant CALLIMANOPULOS informed Plaintiff WAUMBOLDT that she was now the prime suspect in the investigation and that the police would be interrogating her.

114.    Confused as to why she would be the prime suspect, Plaintiff WAUMBOLDT asked Defendant CALLIMANOPULOS if any of the other numerous employees who had access were being questioned, to which he replied "No."

115.    **Two days later, on or about June 24, 2011, under the pretext that Plaintiff had taken the diamonds and money, Mr. Richard Baldwin, Defendants' President, suddenly terminated Plaintiff WAUMBOLDT's employment with Defendants.**

116.    It is clear that despite Plaintiff WAUMBOLDT's excellent work performance, Defendant CALLIMANOPULOS terminated her simply because he realized that he would not be able to use Plaintiff WAUMBOLDT to fulfill his sexual desires.

117.    It is also hereby claimed that Defendant CALLIMANOPULOS fabricated the above theft in order to create a pretextual reason for terminating Plaintiff who was refusing his sexual advances.

118.    Upon information and belief, Defendants have recently found out what ultimately happened to the alleged "stolen" diamonds.

119.    Plaintiff WAUMBOLDT felt **violated, humiliated, and intimidated** by the illegal and repulsive actions of Defendant CALLIMANOPULOS, and felt **offended and humiliated** by the blatantly unlawful and retaliatory termination.

120.    Defendant CALLIMANOPULOS retaliated against Plaintiff WAUMBOLDT for continually rejecting Defendant CALLIMANOPULOS' advances and complaining about his ongoing sexual harassment, by making false accusations against Plaintiff

of employment with the Defendants.

130.    Defendants' actions and conduct were intentional and intended to harm the Plaintiff.

131.    As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

132.    As a result of the Defendants' discriminatory and intolerable treatment of Plaintiff, Plaintiff has suffered severe emotional distress and physical ailments.

133.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

134.    As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

135.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.  As such, the Plaintiff demands Punitive Damages as against both Defendants, jointly and severally.


## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
## AGAINST DEFENDANT BROKERAGE AND DEFENDANT MARINE

136.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

137.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the above-named Defendant BROKERAGE.   Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender (sexual harassment).

138.   Defendant BROKERAGE and Defendant MARINE engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her gender.

### AS A SECOND CAUSE OF ACTION
### FOR DISCRIMINATION UNDER TITLE VII
### AGAINST DEFENDANT BROKERAGE AND DEFENDANT MARINE

139.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

140.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

141.   Defendant BROKERAGE and Defendant MARINE engaged in unlawful employment practice prohibited by 42 U.S.C. §2000e et seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

### AS A THIRD CAUSE OF ACTION
### FOR DISCRIMINATION UNDER STATE LAW

142.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

143.   Executive Law § 296 provides that   "1.  It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

144.   Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex (sexual harassment).

### AS A FOURTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER STATE LAW

145.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

146.   New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

147.   Defendants engaged in an unlawful discriminatory practice by retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

148.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

149.    New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

150.    Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.


## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

151.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

152.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

153.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory

working conditions, and otherwise discriminating against Plaintiff because of her gender (sexual harassment).

## AS A SEVENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

154. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

155. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

156. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## AS AN EIGHTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

157. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

158. The New York City Administrative Code Title 8, §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

159. Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(7) by discriminating against Plaintiff

because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

## AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

160.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

161.    New York City Administrative Code Title 8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

162.    Defendants violated the section cited herein as set forth.

## AS A TENTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

163.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

164.    New York City Administrative Code Title 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

      a.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this

27

section other than subdivisions one and two of this section.

b.  An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1.  the employee or agent exercised managerial or supervisory responsibility; or

2.  the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3.  the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c.  An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

168.  Defendants violated the section cited herein as set forth.

## AS AN ELEVENTH CAUSE OF ACTION FOR
### ASSAULT AND BATTERY

169.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

170.  That the aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of Defendants, their agents, servants and/or employees, suddenly and without provocation did physically assault and batter Plaintiff herein and did cause unwelcome contact, causing the Plaintiff to sustain damages.

160.  That as a direct result of the foregoing, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

## AS A TWELFTH CAUSE OF ACTION FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

161.  Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

162.  Defendants engaged in extreme and outrageous conduct.

163.  Defendants intended to cause, or disregarded a substantial probability of causing, severe emotional distress to Plaintiff.

164.  There exists a causal connection between the above conduct and said injury.

165.  As a result of said conduct Plaintiff suffered and suffers from severe emotional distress.

166.  That as a direct result of the foregoing, Plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

## INJURY AND DAMAGES

167. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to her reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## JURY DEMAND

168. Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et. seq.*; New York State Executive Law §296 *et. seq.*; New York City Administrative Code, §8-107 *et. seq.*; and state common law, that the Defendants discriminated against, and retaliated against Plaintiff on the basis of her gender;

B. Awarding damages to the Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury,

distress, pain and suffering and injury to her reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
        October 19, 2011

PHILLIPS & PHILLIPS,
ATTORNEYS AT LAW, PLLC

William K. Phillips, Esq. (WP0409)
*Attorneys for Plaintiff*
30 Broad Street, 35th Floor
New York, NY 10004
(212) 587-0760

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  Adelheid Waumboldt
2 Water Street
Apt. 6-D
New York, NY 10004

From:  New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐  On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2011-03153 | Jose T. Vega, Investigator | (212) 336-3682 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐  More than 180 days have passed since the filing of this charge.

☒  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

*[signature]* Kevin Berry

**Kevin J. Berry,
District Director**

10/12/2011
*(Date Mailed)*

cc:  **BROKERAGE & MANAGEMENT CORP.**
Attn: Director Human Resources
40 Wall Street
New York, NY 10005

**William Phillips, Esq.**
30 Broad Street
35th Floor
New York, NY 10004